UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OUR WICKED LADY, LLC,
(d/b/a "Our Wicked Lady") *et al.*,

                                        Plaintiffs,

                    v.                                           No. 21-cv-165 (DLC)

ANDREW M. CUOMO, in his official capacity as
Governor of the State of New York, *et al.*,

                                        Defendants.

## STATE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, New York 10005

Matthew L. Conrad
Assistant Attorney General
Of Counsel

**Table of Contents**

PRELIMINARY STATEMENT .................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 2

    A.  The COVID-19 Pandemic and the State's Response.................................... 3

    B.  The Risk of COVID-19 Transmission Posed by New York City's Bars and Restaurants 5

    C.  The Rules Governing New York City's Bars and Restaurants ....................... 6

    D.  Current State Restrictions on Fitness Centers ............................................. 7

    E.  The Present Lawsuit ................................................................................. 8

STANDARD OF REVIEW ........................................................................................ 8

    A.  Preliminary Injunction Standard of Review .................................................. 8

    B.  The *Jacobson* Standard ............................................................................ 9

ARGUMENT ........................................................................................................ 11

    I.  PLAINTIFFS CANNOT ESTABLISH A CLEAR OR SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS................................................................... 11

    A.  Plaintiffs' State Constitutional Claims Are Barred by the Eleventh Amendment .......... 11

    B.  Plaintiffs' Due Process Claims Will Not Succeed ....................................... 12

    C.  Plaintiffs' Equal Protection Claims Will Not Succeed ................................. 16

    D.  Plaintiffs' Takings Claim Will Not Succeed ............................................... 20

    II.  PLAINTIFFS HAVE NOT SHOWN LIKELIHOOD OF IRREPARABLE HARM ........ 23

    III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF NEW YORK'S MISSION TO PROTECT ITS CITIZENS ....................................... 24

CONCLUSION ..................................................................................................... 25

## Table of Authorities

**Cases**                                                     **Page(s)**

*1256 Hertel Ave. Associates, LLC v. Calloway,*
761 F.3d 252 (2d Cir. 2014) ........................................................................... 20, 21, 22

*Albright v. Oliver,*
510 U.S. 266 (1994) ............................................................................................. 15

*Armour v. City of Indianapolis,*
566 U.S. 673 (2012) ............................................................................................. 17

*Beal v. Stern,*
184 F.3d 117 (2d Cir. 1999) ................................................................................. 9

*Bocelli Ristorante Inc. v. Cuomo,*
2020 WL 7038722 (N.Y. Sup. Ct., Richmond Cty., Nov. 6, 2020) ...................... 18

*Buffalo Teachers Fed. v. Tobe,*
464 F.3d 362 (2d Cir. 2006) ............................................................................ 20, 21

*College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,*
527 U.S. 666 (1999) ............................................................................................. 13

*Columbus Ale House v. Cuomo,*
No. 20-CV-4291, 2020 WL 6118822 (E.D.N.Y. Oct. 16, 2020) ......................... passim

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,*
508 U.S. 602 (1993) ............................................................................................. 21

*Conn v. Gabbert,*
526 U.S. 286 (1999) ............................................................................................. 13

*County of Sacramento v. Lewis,*
523 U.S. 833 (1998) ............................................................................................. 15

*Cranley v. Natl. Life Ins. Co. of Vt.,*
318 F.3d 105 (2d Cir. 2003) ................................................................................. 16

*Davis v. New York,*
316 F.3d 93 (2d Cir. 2002) ................................................................................... 12

*Doe v. N.Y.U.,*
666 F.2d 761 (2d Cir. 1981) ................................................................................. 9

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006) ............................................................................................. 24

*Elmsford Apartment Assocs., LLC v. Cuomo,*
    469 F. Supp. 3d 148 (S.D.N.Y. 2020) ................................................................ 21, 22

*Fernandes v. Moran,*
    No. 2:17-cv-03430, 2018 WL 2103206 (E.D.N.Y. May 7, 2018) ................................ 20

*Grand River Enters. Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007) .................................................................................. 23

*Grand River Enters. Six Nations, Ltd. v. Pryor,*
    425 F.3d 158 (2d Cir. 2005) ................................................................................ 13

*Hartman v. Acton,*
    No. 20 Civ. 1952, 2020 WL 1932896 (S.D. Ohio April 21, 2020) ............................ 14

*Hodel v. Va. Surface Mining & Reclamation Ass'n,*
    452 U.S. 264 (1981) ........................................................................................... 14

*Hopkins Hawley LLC d/b/a Seaport House v. Cuomo,*
    No. 20-CV-10932, 2021 WL 465437 (S.D.N.Y. Feb. 9, 2021) ........................... passim

*Hu v. City of New York,*
    927 F.3d 81 (2d Cir. 2019) .................................................................................. 13

*Jacobson v. Massachusetts,*
    197 U.S. 11 (1905) .......................................................................................... 9, 11

*JWJ Indus., Inc. v. Oswego Cty,*
    538 F. App'x 11 (2d Cir. 2013) .......................................................................... 13

*Kabrovski v. City of Rochester,*
    149 F. Supp. 3d 413 (W.D.N.Y. 2015) ................................................................. 22

*Kelly v. N.Y. Civil Serv. Comm'n,*
    632 F. App'x 17 (2d Cir. 2016) .......................................................................... 12

*Kelo v. City of New London, Connecticut,*
    545 U.S. 469 (2005) ........................................................................................... 20

*L&M Bus Corp. v. Bd. of Educ.,*
    2018 WL 2390125 (E.D.N.Y. May 25, 2018) .......................................................... 8

*Li v. Lorenzo,*
    712 F. App'x 21 (2d Cir. 2017) .......................................................................... 12

*Lingle v. Chevron U.S.A. Inc.,*
    544 U.S. 528 (2005) ...................................................................................... 20, 21

*Logan v. Zimmerman Brush Co.,*
    455 U.S. 422 (1982) ....................................................................................... 14

*Luke's Catering Service, LLC v. Cuomo,*
    No. 20-CV-1086S, 2020 WL 5425008 (W.D.N.Y. Sept. 10, 2020) ......................... 10, 11

*Make the Rd. New York v. Cuccinelli,*
    419 F. Supp. 3d 647 (S.D.N.Y. 2019) ................................................................. 24

*Maryland v. King,*
    567 U.S. 1301 (2012) ...................................................................................... 24

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ....................................................................................... 12

*Meriden Tr. & Safe Deposit Co. v. F.D.I.C.,*
    62 F.3d 449 (2d Cir. 1995) ............................................................................... 22

*Million Youth March, Inc. v. Safir,*
    155 F.3d 124 (2d Cir. 1998) ............................................................................. 25

*Murr v. Wisconsin,*
    137 S. Ct. 1933 (2017) .................................................................................... 22

*New York State Rifle & Pistol Ass'n v. City of N.Y.,*
    86 F. Supp. 3d 249 (S.D.N.Y. 2015) .................................................................. 25

*Nken v. Holder,*
    556 U.S. 418 (2009) ......................................................................................... 8

*O'Bannon v. Town Court Nursing Center,*
    447 U.S. 773 (1980) ....................................................................................... 14

*Otoe-Missouria Tribe v. New York State Dep't of Fin. Svcs.,*
    769 F.3d 105 (2d Cir. 2014) ............................................................................. 24

*Page v. Cuomo,*
    478 F. Supp. 3d 355 (N.D.N.Y. 2020) ............................................................... 16

*Palazzolo v. Rhode Island,*
    533 U.S. 606 (2001) ....................................................................................... 20

*Pappas v. Town of Enfield,*
    602 F. App'x 35 (2d Cir. 2015) ................................................................. 17, 18, 19

*Parratt v. Taylor,*
    451 U.S. 527 (1981) ....................................................................................... 14

*Pena v. DePrisco,*
  432 F.3d 98 (2d Cir. 2005) ................................................................. 14

*Penn. Cent. Transp. Co. v. City of N.Y.,*
  438 U.S. 104 (1978) ........................................................................... 20

*Pennhurst State Sch. & Hosp. v. Halderman,*
  465 U.S. 89 (1984) ...................................................................... 11, 12

*People ex. rel. Schneiderman v. Actavis PLC,*
  787 F.3d 638 (2d Cir. 2015) ................................................................. 9

*Poe v. Leonard,*
  282 F.3d 123 (2d Cir. 2002) ............................................................... 15

*Pollok v. Chen,*
  806 F. App'x 40 (2d Cir. 2020) .......................................................... 14

*Prestopnik v. Whelan,*
  249 F. App'x 210 (2d Cir. 2007) .................................................. 17, 19

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
  141 S. Ct. 63 (2020) .......................................................................... 10

*S. Bay United Pentecostal Church v. Newsom,*
  140 S. Ct. 1613 (2020) ...................................................................... 10

*Salinger v. Colting,*
  607 F.3d 68 (2d Cir. 2010) ................................................................. 24

*Sanitation and Recycling Indus. v. City,*
  925 F. Supp. 407 (S.D.N.Y. 1996) .................................................... 14

*Savage v. Mills,*
  2020 WL 4572314 (D. Me. Aug. 7, 2020) ........................................ 13

*Seminole Tribe of Florida v. Florida,*
  517 U.S. 44 (1996)............................................................................. 12

*Sensational Smiles, LLC v. Mullen,*
  793 F.3d 281 (2d Cir. 2015) ............................................................... 17

*Smith v. Half Hollow Hills Cent. School Dist.,*
  298 F.3d 168 (2d Cir. 2002) ............................................................... 15

*Spavone v. New York State Dep't of Corr. Servs.,*
  719 F.3d 127 (2d Cir. 2013) ............................................................... 16

*United States v. Salerno,*
    481 U.S. 739 (1987) ............................................................................................ 16

*Velez v. Levy,*
    401 F.3d 75 (2d Cir. 2005) .............................................................................. 15

*Vill. of Willowbrook v. Olech,*
    528 U.S. 562 (2000) ........................................................................................ 17

*Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.,*
    149 F. Supp. 3d 376 (E.D.N.Y. 2016) ............................................................ 23

*Walker v. City of Waterbury,*
    361 F. App'x 163 (2d Cir. 2010) ..................................................................... 15

*Weinberger v. Romero–Barcelo,*
    456 U.S. 305 (1982) ........................................................................................ 25

*West Coast Hotel Co. v. Parrish,*
    300 U.S. 379 (1937) ........................................................................................ 17

*White Plains Towing Corp. v. Patterson,*
    991 F.2d 1049 (2d Cir. 1993) .......................................................................... 12

*Winter v. Natural Res. Defense Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................... 8, 24, 25

*World Gym, Inc. v. Baker,*
    474 F. Supp. 3d 426 (D. Mass. 2020) ............................................................. 15

*Yee v. City of Escondido, Cal.,*
    503 U.S. 519 (1992) ................................................................................... 20, 22

Defendants Andrew M. Cuomo, sued in his official capacity as Governor of the State of New York ("Governor Cuomo"), and the State of New York (collectively, "State Defendants"), respectfully submit this memorandum of law, together with the Declaration of Emily C. Lutterloh, M.D., MPH, dated February 23, 2021 ("Lutterloh Decl."), in opposition to Plaintiffs' motion for a preliminary injunction (ECF No. 8).

## PRELIMINARY STATEMENT

The State of New York, along with the rest of the world, continues to confront the greatest public health crisis in living memory. The COVID-19 pandemic has caused nearly 20,000 deaths in New York City alone, an enormous number that could have been far higher had the State not taken urgent action to halt the spread of the virus by mandating temporary restrictions on businesses and social gatherings. The State continues to work to balance the lives, health, and safety of its citizens with the need to protect their livelihoods. But the danger of a resurgence in cases remains clear and present, particularly in the face of new strains that may be more transmissible, deadly, or resistant to vaccines. The State's response continues to be carefully calibrated to ensure that activities with the highest risk of spreading contagion do not imperil New York's progress.

By this lawsuit, Plaintiffs seek to undermine these efforts and enjoin Executive Orders ("EOs") that were designed to mitigate the significant increased risk of COVID-19 transmission posed by indoor dining by seeking to overturn restrictions on indoor dining in New York City. Indoor dining at bars and restaurants is a particularly high risk activity because COVID-19 spreads more easily indoors, diners and drinkers cannot wear masks while dining and drinking, and dining and drinking at a bar or restaurant can encourage congregating and mingling, furthering the risk of spread. Because of its large population and high population density, these risks are particularly acute in New York City. As a result of increased COVID-19 infection rates in New York City and statewide, Governor Cuomo issued a series of EOs that have the effect of permitting indoor dining in New York City at a 25%

1

percent of maximum occupancy, while continuing to permit outdoor dining, take-out, and delivery.

Plaintiffs allege, *inter alia*, that they are primarily bars and restaurants located in New York City. They seek a preliminary injunction against the 25% capacity limit on indoor dining in New York City.[1] However, Plaintiffs' do not meet the high burden of establishing the elements required for the extraordinary relief of a mandatory injunction.

First, Plaintiffs possess no clear or substantial likelihood of success on the merits. Plaintiffs' claims all fail for the fundamental reason that the ban on indoor dining is rationally related to the State's interest in avoiding increased transmission of COVID-19 cases and the concomitant threat to public health. Further, Plaintiffs' three asserted claims, allegedly arising under the due process clause, the equal protection clause, and the takings clause, all fail of their own accord. Nor can Plaintiffs establish imminent, irreparable harm, as they have failed to demonstrate that the temporary capacity restrictions on indoor dining, coupled with the continuation of outdoor dining and take-out and delivery services, will lead to the imminent closure of their businesses, rather than a temporary financial loss of revenue. And finally, the balance of equities and the public interest weigh overwhelmingly in favor of New York's mission to protect all New Yorkers from the imminent dangers presented by COVID-19, which has already resulted in the deaths of tens of thousands of New Yorkers.

Accordingly, Plaintiffs' motion for a preliminary injunction should be denied.

## FACTUAL BACKGROUND

As the Court is aware, the ongoing COVID-19 pandemic has caused nearly 40,000 in New York State, nearly 20,000 of which were in New York City, and millions of deaths worldwide.[2] New

---

[1] Several of the Plaintiffs are yoga and martial arts studios, rather than restaurants and bars. As discussed further *infra*, it is not clear what preliminary relief, if any, Plaintiffs are seeking on behalf of those entities.

[2] *See* Fatalities Data, New York State Department of Health ("DOH"), https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?:embed=yes&:toolbar=no&:tabs=n

York was, for much of last spring, the global epicenter of the crisis.[3] Thanks to the lifesaving efforts of the State, medical professionals, essential workers, and ordinary New Yorkers who have heeded calls to wear masks, practice social distancing, and observe other health measures, New York's daily death toll has been reduced to a fraction of its peak of approximately 800 per day,[4] which is still a sobering number of individuals. The threat is far from over, however, as thousands of New Yorkers remain hospitalized.[5] Moreover, it is unclear what kind of havoc new strains will wreak in the State.[6] *See* Lutterloh Decl., ¶¶ 42, Ex. Q. Continued vigilance is, therefore, necessary to prevent this deadly pandemic from further afflicting the State and New Yorkers and from requiring additional extensive shutdowns of businesses. *See generally* Lutterloh Decl. ¶¶ 42-49.

### A.      The COVID-19 Pandemic and the State's Response

On March 7, 2020, pursuant to N.Y. Exec. Law § 29-a, Governor Cuomo issued EO 202, implementing the State Comprehensive Emergency Management Plan and declaring a statewide disaster emergency in response to the emerging COVID-19 viral pandemic. *See* Lutterloh Decl., ¶ 14, Ex. F. By Executive Order 202, the Governor suspended all State and local laws, rules, and regulations to the extent necessary to cope with the COVID-19 emergency. *Id.* Following the issuance of EO 202, Governor Cuomo issued multiple supplemental Executive Orders, continuing the temporary suspension and modification of certain laws relating to the state of emergency. *See, e.g.*, Lutterloh Decl., ¶¶ 19-33, Exs. G to P.

---

[3] *See* New York Times, *New York City Region Is Now an Epicenter of the Coronavirus Pandemic* (March 22, 2020), https://nyti.ms/3kUJgbs.

[4] *See* New York Data, The COVID Tracking Project, https://covidtracking.com/data/state/new-york#historical

[5] *See id.*

[6] *See* Press Release, "Governor Cuomo Announces Three Additional Cases of UK Strain Found In New York" (Jan. 9, 2021), available at https://www.governor.ny.gov/news/governor-cuomo-announces-three-additional-cases-uk-strain-identified-new-york

On March 16, 2020, EO 202.3 suspended on-premises service of food and beverages in all bars and restaurants. Lutterloh Decl. ¶ 20, Ex. H. Executive Order 202.3 provided that "[a]ny restaurant or bar in the state of New York shall cease serving patrons food or beverage on-premises effective at 8 pm on March 16, 2020, and until further notice shall only serve food or beverage for off-premises consumption." *Id.* On March 20, 2020, Governor Cuomo announced closure of all non-essential businesses and prohibited non-essential gatherings of individuals of any size for any reason. *Id.* at ¶¶ 22-24. EO 202.6 listed which businesses and services in New York State were deemed "essential" and directed the Empire State Development Corporation ("ESD"), a New York State public benefit corporation, to issue guidance to further clarify which businesses would be considered "essential" or "non-essential." *Id.* at ¶ 12, Ex. K. The ESD guidance designated "Restaurants/bars (but only for take-out/delivery)" as essential businesses.[7]

Over the course of May and June 2020, New York began a phased plan to guide the reopening of non-essential businesses. Lutterloh Decl., ¶¶ 34-41. This initiative was intended to begin reopening New York's economy in a gradual and measured way that would prevent any new spikes in COVID-19 cases. *See id.* Through this phased reopening, which has been primarily data-driven and guided by public health experts, the State was able to keep the daily number of new infections and new deaths relatively flat at a time when cases were spiking throughout the rest of the country. *See id.*

Outside of New York City, restaurants were permitted to open for indoor dining at 50% capacity, with other restrictions, when a region entered "Phase 3." However, indoor dining was not initially permitted in New York City, given the significant risks of COVID-19 transmission presented by indoor dining in densely populated New York City.[8] *See id.* ¶¶ 88-92.

---

[7] ESD Guidance For Determining Whether a Business Enterprise is Subject to a Workforce Reduction Under Recent Executive Orders, https://esd.ny.gov/guidance-executive-order-2026.

[8] *See* Press Release, *Governor Cuomo Announces New York City Enters Phase III of Reopening Without Indoor Dining and Subject to State Guidance Today* (Jul. 6, 2020), available at

B.     **The Risk of COVID-19 Transmission Posed by New York City's Bars and Restaurants**

COVID-19 primarily spreads through person-to-person contact via respiratory droplets, and it may be spread by those who are asymptomatic. *See* Lutterloh Decl., ¶¶ 57-60, Exs. T-W. Indoor spaces present greater risks of COVID-19 transmission than outdoor spaces. *See id.* ¶¶ 54-82 and referenced exhibits. As noted by the U.S. Centers for Disease Control and Prevention ("CDC"), it is more difficult to keep people apart indoors versus outdoors, "there's less ventilation," and, therefore, the CDC recommends that individuals "[c]hoose outdoor activities and places where it's easy to stay 6 feet apart, like parks and open-air facilities."[9] Notably, a "study of the more than 300 outbreak clusters of COVID-19 in China reveals that the majority of the outbreaks were fueled by indoor transmission of the disease, while outdoor transmission was scarce."[10] Another study designed to analyze this issue similarly concluded that "[t]he virus is harder to transmit outdoors because the droplets that spread it are more easily disturbed or dispersed outside in the elements than in a closed, confined, indoor setting."[11] Other research studies showed that outbreaks in cities and states that permitted indoor dining "stemmed from bars and restaurants." Lutterloh Decl. ¶ 80, Ex. JJ.

Although the risk of COVID-19 transmission can be mitigated by wearing masks, it is plainly not possible for an individual to eat or drink while wearing a mask. Therefore, bars and restaurants are necessarily high risk for transmission of the virus. *Id.* ¶¶ 81-82, Ex. KK-JJ. Further, individuals in bars and restaurants may congregate and mingle and may become more lax in observing safety

---

https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-city-enters-phase-iii-reopening-without-indoor-dining-and.

[9] CDC, Your Health, *Deciding to Go Out,* https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/deciding-to-go-out.html (Jan. 10, 2021).

[10] The Hill, *New study finds few cases of outdoor transmission of coronavirus in China* (Apr. 23, 2020), https://bit.ly/2S8ino6.

[11] The Hill, *Evidence mounts that outside is safer when it comes to COVID-19* (May 6, 2020), https://bit.ly/3mVjsh4.

protocols, which increases the risk of spread. In a recent study conducted by the CDC, individuals who tested positive for COVID-19 were found twice as likely to have been in a bar or restaurant recently than individuals who have not tested positive.[12] There is a higher risk of more extensive COVID-19 transmission and spread in New York City than in the rest of the State because it is both more populated and more densely populated than the rest of the State. *See id.* at ¶¶ 89-91. Indeed, the five counties making up New York City are the most densely populated counties in the State.[13]

C.    **The Rules Governing New York City's Bars and Restaurants**

New York bars and restaurants have been permitted to remain open for take-out and delivery services throughout the entirety of the pandemic. *See* EO 202.6 and ESD Guidelines. EO 202.3 also allowed bars and restaurants to sell alcoholic beverages for take-out and delivery, a new privilege ordinarily reserved for liquor stores and grocery stores. *See* Lutterloh Decl, Ex. H. On June 6, 2020, Governor Cuomo issued EO 202.38, which allowed restaurants to serve patrons on-premises, but "only in outdoor space, provided such restaurant or bar is in compliance with Department of Health guidance promulgated for such activity."[14]

On January 29, 2021, in consideration of the downward trajectory of infections in New York City, Governor Cuomo announced that indoor dining in New York City could resume at 25% of capacity, beginning on February 12, 2021.[15] On that date, EO 202.93 took effect, permitting indoor

---

[12] *See* CDC Report, *Community and Close Contact Exposures Associated with COVID-19 Among Symptomatic Adults ≥18 Years in 11 Outpatient Health Care Facilities — United States, July 2020*, available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6936a5.htm?s_cid=mm6936a5_x.

[13] *See* Table 2: Population, Land Area, and Population Density by County, New York State 2017, New York State Department of Health, available at https://www.health.ny.gov/statistics/vital_statistics/2017/table02.htm.

[14] *See* N.Y. Exec. Order 202.38 (June 6, 2020), available at https://www.governor.ny.gov/news/no-20238-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency.

[15] https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-city-indoor-dining-can-reopen-early-february-12

dining at 25% capacity in New York City.[16] On February 19, 2021, the Governor announced that the occupancy limitation will increase to 35% effective Friday, February 26, 2021.[17]

The Governor's EOs regarding restaurant and bar services have sought to balance industry needs with a safe reopening that avoids unnecessary congregating and mingling. *See, e.g.,* Lutterloh Decl. ¶¶ 26-33. As a logical matter, the more people an individual interacts with at a gathering, and the longer that interaction lasts, the higher the potential risk of their becoming infected with COVID-19 and spreading the disease. A lengthy period of time occupying the same space is an important factor in increased risk of transmitting the COVID-19 virus. *See, e.g., id.* at ¶ 91. The current rules limiting indoor dining mitigate these risks. *Id.* at ¶ 92.

### D.   Current State Restrictions on Fitness Centers

Gyms and similar businesses also present an inherently increased risk for the spread of COVID-19, and as such have also been subject to restrictions for the protection of public health. Lutterloh Decl. ¶¶ 93-95, Exs VV-WW. The ESD guidance issued pursuant to EO 202.6 did not list such businesses as "essential," and as such they were not permitted to operate starting on March 20, 2020.[18] On August 17, 2020, Governor Cuomo announced that gyms would be permitted to reopen at 33% capacity beginning on August 24, 2020, except that New York City officials would be permitted to determine whether reopening should be permitted within New York City.[19] Further, local officials (including in New York City) would be able to determine whether indoor group fitness classes could resume. Lutterloh Decl. ¶ 96, Ex. WW. That guidance remains in effect. *Id.*

---

[16] *See* N.Y. Exec. Order 202.93 (Feb. 12, 2021), available at https://www.governor.ny.gov/news/no-20293-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency

[17] https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-cuomo-announces-nursing-home-visitations-resume

[18] See ESD Guidance, *supra*, n.7.

[19] https://www.governor.ny.gov/news/governor-cuomo-announces-gyms-and-fitness-centers-can-reopen-starting-august-24

### E.      The Present Lawsuit

Plaintiffs are a group of 74 New York City businesses. Sixty-nine of them are bars and restaurants, while the remaining five (the "Fitness Center Plaintiffs") are yoga and martial arts studios. Compl. ¶¶ 17-92. Plaintiffs commenced this proceeding by filing a complaint on or about January 8, 2021. The complaint alleges six causes of action against the State Defendants, as well as against New York City and its mayor, Bill de Blasio. Plaintiffs filed their motion for a preliminary injunction on February 5, 2021, asking that the Court enjoin the relevant EO that establish the 25% cap on indoor dining within New York City (collectively, the "Executive Orders"), and permit the plaintiffs to instead operate their restaurants at a 50% capacity cap.[20]

## STANDARD OF REVIEW

### A.      Preliminary Injunction Standard of Review

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). And, the movant bears the heavy burden of establishing each of the following elements: (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Id.* at 20. The final two factors – the balance of the equities and the public interest – "'merge when the Government is the opposing party.'" *L&M Bus Corp. v. Bd. of Educ.*, 2018 WL 2390125, at *13 (E.D.N.Y. May 25, 2018) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

---

[20] It is unclear what relief, if any, the Fitness Center Plaintiffs are seeking through this motion, and many of the arguments in Plaintiffs' memorandum of law do not address these Plaintiffs' circumstances. Nor do Plaintiffs even allege what restrictions the Fitness Center Plaintiffs are currently subject to. In any event, because the current restrictions on fitness centers have been imposed by the City of New York rather than the State Defendants (albeit under authority granted to the City by the State), this memorandum will primarily focus on the restaurant and bar plaintiffs, rather than the Fitness Center Plaintiffs.

In addition, the Second Circuit has "held the movant to a heightened standard" where, as here: (i) an injunction is "mandatory" (i.e., altering the status quo rather than maintaining it), or (ii) the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *People ex. rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015). In such cases, "the movant must show a 'clear' or 'substantial' likelihood of success on the merits and make a 'strong showing' of irreparable harm, in addition to showing that the preliminary injunction is in the public interest." *Id.* (quoting *Beal v. Stern*, 184 F.3d 117, 123 (2d Cir. 1999); *Doe v. N.Y.U.*, 666 F.2d 761, 773 (2d Cir. 1981)).

Here, Plaintiffs are seeking to alter the status quo. As of February 12, 2021, restaurants in New York City may operate indoor dining at 25% of operating capacity, which will be increased to 35% effective February 26, 2021. Plaintiffs seek to alter this status quo so that they can offer indoor dining at 50% of operating capacity. Thus, Plaintiffs' motion is subject to the heightened standard for a mandatory injunction.

### B.    The *Jacobson* Standard

This is the latest in a series of actions that have challenged state and local government restrictions on in-person gatherings enacted to reduce the death toll of COVID-19. Such actions contradict a long line of precedent, dating back to *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), in which the Supreme Court declared that "a community has the right to protect itself against an epidemic of disease which threatens its members," and that, in such times, judicial scrutiny is reserved for a measure that "has no real or substantial relation to" the object of protecting the public or is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 27, 31; *Hopkins Hawley LLC d/b/a Seaport House v. Cuomo* ("*Seaport House*"), No. 20-CV-10932, 2021 WL 465437 (S.D.N.Y. Feb. 9, 2021) (Crotty, J.) (relying on *Jacobson* to uphold capacity restrictions on indoor dining). As Chief Justice Roberts recently observed: "The precise question of when restrictions on

particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement." *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring). Justice Roberts cautioned that a court should be especially reluctant to impose its own judgment in order to set aside acts of those better trained and charged with responsibility to respond to matters "fraught with medical and scientific uncertainties," and, in the face of those uncertainties, the latitude given those officials "must be especially broad." *Id.*; *see also Seaport House*, 2021 WL 465437, at *3 (citing *S. Bay United Pentecostal Church*); *Luke's Catering Service, LLC v. Cuomo*, No. 20-CV-1086S, 2020 WL 5425008, at *14-15 (W.D.N.Y. Sept. 10, 2020) (applying *Jacobson* to deny preliminary injunction and grant cross-motion to dismiss, in a challenge to New York's 50-person limit on event and banquet venues).

Indeed, recently, the *Jacobson* holding has recently been applied in rejecting multiple challenges to New York City indoor dining restrictions imposed by the same Executive Orders at issue here. *See Seaport House*, 2021 WL 465437 (S.D.N.Y. Feb. 9, 2021) (applying the *Jacobson* standard and denying a preliminary injunction against the same dining restrictions at issue in the present matter); *Columbus Ale House v. Cuomo*, No. 20-CV-4291, 2020 WL 6118822, at *3-4 (E.D.N.Y. Oct. 16, 2020) (applying *Jacobson* standard to substantive due process claim challenging executive order requiring restaurants to close at midnight). This Court too should view the constitutional issues arising in this case through the deferential lens of *Jacobson*.[21]

---

[21] While the validity of *Jacobson* has recently been called into question with respect to cases arising under the Free Exercise Clause of the First Amendment, *see Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020), it remains valid with respect to other constitutional questions. *See Seaport House*, 2021 WL 465437, at *3-*5 (considering in detail whether *Jacobson* has been abrogated in its entirety, and concluding, with respect to the same Executive Orders at issue here, that "*Jacobson's* deferential standard of judicial review is still applicable" and that "this Court is bound by it.").

## ARGUMENT

### I.   PLAINTIFFS CANNOT ESTABLISH A CLEAR OR SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

In their Complaint and motion for a preliminary injunction, Plaintiffs bring six claims. They allege that the Executive Orders violate their due process rights, violate their equal protection rights, and constitute an impermissible taking, each under both the federal and New York State constitutions. As an initial matter, Plaintiffs are unlikely to be able to show that the Executive Orders violate the *Jacobson* standard. Indeed, just several weeks ago, another Southern District of New York Court, considering what was then a total prohibition on indoor dining within New York City (rather than the 25% limit in place today), concluded that Plaintiffs do not meet *Jacobson*'s standard. In *Seaport House*, Judge Crotty concluded that:

> The Dining Policy bears a relation to the public welfare by seeking to curb the transmission of COVID-19 in higher risk settings such as restaurants. *See Columbus Ale*, 2020 WL 6118822, at *4; *Luke's Catering Serv., LLC v. Cuomo*, No. 20-CV-1086S, 2020 WL 5425008, at *7 (W.D.N.Y. Sept. 10, 2020). Moreover, Plaintiffs have not shown that the Dining Policy is "beyond all question, a plain, palpable invasion of rights secured by fundamental law." *Jacobson*, U.S. at 31. On the contrary, their requested relief—50% of indoor dining and extension of the dining curfew to midnight— implicitly concedes that public health regulation of restaurants, in view of the pandemic, is constitutional. But because the constitutionality of the Dining Policy cannot turn on granular distinctions (such as two additional hours of dining service or a 50% increase in capacity limits), the Court concludes that the Plaintiffs' claims are unlikely to succeed under *Jacobson*.

*Seaport House*, 2021 WL 465437, at *6.

The same conclusion applies here. However, even under traditional constitutional analysis, Plaintiffs cannot demonstrate a likelihood of success on the merits of their claims.

### A.   Plaintiffs' State Constitutional Claims Are Barred by the Eleventh Amendment

Each of Plaintiffs' three claims brought pursuant to the New York State Constitution cannot succeed, as these claims are manifestly barred from consideration in this Court pursuant to the principle of state sovereign immunity embodied in the Eleventh Amendment of the U.S. Constitution.

*See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 103-06 (1984) (Eleventh Amendment prevents suit requiring state official to follow state law). The Eleventh Amendment prohibits lawsuits against a state without the state's unambiguous consent or an act of Congress. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54-55 (1996). This immunity "includes suits against state officials in their official capacities," such as Governor Cuomo. *Li v. Lorenzo*, 712 F. App'x 21, 22 (2d Cir. 2017) (summary order) (*citing Davis v. New York*, 316 F.3d 93, 101-02 (2d Cir. 2002)). The Eleventh Amendment bar against state law claims exists irrespective of the relief sought. *Kelly v. N.Y. Civil Serv. Comm'n*, 632 F. App'x 17, 18 (2d Cir. 2016) (summary order) (holding that the *Ex Parte Young* exception does not allow a federal court to issue an injunction for a violation of state law). The fact that Plaintiffs have also alleged federal causes of action is of no consequence because "[t]his constitutional bar applies to pendent claims as well." *Pennhurst*, 465 U.S. at 120.

**B.    Plaintiffs' Due Process Claims Will Not Succeed**

Plaintiffs assert that both their procedural and substantive due process rights have been violated. Neither branch of this argument can succeed.

1.    <u>Plaintiffs Have Failed to Identify a Protected Interest</u>

It is well-established that the threshold question in a Section 1983 case alleging a due process violation is whether the plaintiffs possess an actionable liberty or property interest. *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1061-62 (2d Cir. 1993) ("In order to succeed on a claim of deprivation of procedural due process, a plaintiff must establish that state action deprived him of a protected property or liberty interest.") (citing *Mathews v. Eldridge,* 424 U.S. 319, 332 (1976)). Here, in an attempt to satisfy that requirement, Plaintiffs claim that they "have a fundamental property interest in conducting lawful business activities" and in "certain personal choices central to individual dignity and autonomy," namely, the ability to operate their businesses. (Plaintiffs' Memorandum of Law in Support of Preliminary Injunction ("Pl. Mem.") (ECF No. 8), p. 11.)

12

However, these interests cannot support a due process claim. "[B]usiness in the sense of *the activity of doing business*, or *the activity of making a profit* is not property in the ordinary sense." *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999). "Harm to business interests…is not a 'plain, palpable invasion of rights' under the Fourteenth Amendment." *Savage v. Mills*, 2020 WL 4572314, at *8 (D. Me. Aug. 7, 2020). Nor is lost revenue sufficient to support a due process claim. *Hu v. City of New York*, 927 F.3d 81, 102 (2d Cir. 2019) ("the right of occupational choice is afforded Due Process protection only when a plaintiff is 'complete[ly] prohibit[ed]' from engaging in his or her chosen profession) (quoting *Conn v. Gabbert*, 526 U.S. 286, 291 (1999)); *see also Columbus Ale House*, 2020 WL 6118822, at *4-5 (plaintiff unlikely to succeed on claim that COVID-19 related ban on restaurant service after midnight in New York City infringed its due process rights); *see also JWJ Indus., Inc. v. Oswego Cty*, 538 F. App'x 11, 14 (2d Cir. 2013) ("Due process has not be construed to preclude government actions that adversely affect a business's profitability.").

Here, Plaintiffs' restaurants have not been shut down. To the contrary, they have been permitted to provide take-out and delivery service throughout the pandemic, were provided the additional authorization to serve alcoholic beverages on a to-go basis, were allowed to resume outdoor dining on June 22, 2020, and are currently permitted to operate indoor dining at 25% capacity, which will be increased to 35% occupancy effective February 26, 2021. Lutterloh Decl. ¶ 88, Ex. RR. While the Executive Orders restrict the manner in which Plaintiffs' businesses operate to protect public health, their operations have never been prohibited entirely.

2.    Plaintiffs Were Not Entitled to Notice and an Opportunity to be Heard With Respect to Directives that Are Legislative in Nature

Even if Plaintiffs stated a valid property interest, which they do not, Plaintiffs would not be entitled to notice and an opportunity to be heard as the relevant Executive Orders are legislative in nature, are applicable to all restaurants and fitness establishments in New York City, and do not target Plaintiffs individually. *See Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 174 (2d Cir. 2005)

("[o]fficial action that is legislative in nature is not subject to the notice and hearing requirements of the due process clause"); *Seaport House*, 2021 WL 465437, at *7 (holding that the same restrictions at issue in this case are legislative in nature and thus not susceptible to a procedural due process claim)

As stated in *Hartman v. Acton*, No. 20 Civ. 1952, 2020 WL 1932896, at * 8 (S.D. Ohio April 21, 2020), "[a] person adversely affected by a law of general applicability has no due process right to a hearing[.]" *Id.* (State's Order directing non-essential businesses to cease operating their physical locations did not violate plaintiffs' due process rights); *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982) (an individual's due process rights are not violated by a law of general applicability since "the legislative determination provides all the process that is due"). Moreover, "[i]t is well established that a government's change in established policy, even if it works to an individual's commercial detriment, does not create entitlement to a hearing." *Sanitation and Recycling Indus. v. City*, 925 F. Supp. 407 (S.D.N.Y. 1996), citing *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 789 (1980).[22]

As the challenged Executive Orders are legislative in nature and set forth generally applicable requirements for the public, Plaintiffs' procedural due process claim fails.

### 3.   Plaintiffs Have No Viable Substantive Due Process Claim

To state a substantive due process claim, "a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Pollok v. Chen*, 806 F. App'x 40, 45 (2d Cir. 2020) (quoting *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005)). That is hardly the case here.

---

[22] Even if Plaintiffs had identified a protected property right and the EOs was not considered legislative in nature, due process does not automatically trigger a right to a pre-deprivation hearing. *Parratt v. Taylor*, 451 U.S. 527 (1981). Rather, summary administrative action is justified to protect the health and safety of the public. *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 300 (1981).

As an initial matter, the scope of rights afforded by the substantive component of the due process clause is extremely limited. Indeed, "[i]t is well-established that substantive due process protections extend only to those interests that are implicit in the concept of ordered liberty," that is, "rights so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Walker v. City of Waterbury*, 361 F. App'x 163, 165 (2d Cir. 2010) (summary order) (internal quotation marks and citations omitted). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 271-72 (1994) (citations omitted). Interests related to commerce and employment are generally not considered fundamental rights subject to substantive due process protection. *Walker*, 361 F. App'x at 165.

But even if Plaintiffs had claimed infringement of a "fundamental right," only a narrow range of extreme government conduct falls within the scope of a substantive due process claim. Indeed, only egregious or outrageous conduct that shocks the conscience is actionable. *See County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *see also Poe v. Leonard*, 282 F.3d 123, 139 (2d Cir. 2002) (applying *Sacramento*). The Second Circuit has expounded on this standard and required the government conduct to be "brutal and offensive to human dignity[.]" *Smith v. Half Hollow Hills Cent. School Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) (internal citations and quotations omitted). Stated another way, there must be a "malicious and sadistic" abuse of power that has no legitimate government purpose and that is intended to oppress or cause injury. *See Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005).

Here, the Executive Orders are clearly aimed at preventing the spread of COVID-19, a deadly and highly infectious disease that has affected the lives of all New Yorkers. As such, temporary restrictions on businesses to prevent loss of life cannot rationally be considered conscience-shocking. *See World Gym, Inc. v. Baker*, 474 F. Supp. 3d 426, 433 (D. Mass. 2020) finding COVID-19 related order requiring gyms to close was not conscience-shocking); *Page v. Cuomo*, 478 F. Supp. 3d 355, 371

(N.D.N.Y. 2020) (finding COVID-19 related quarantine order was not conscience-shocking). Nor can it be denied that the Executive Orders were issued in pursuit of a legitimate government purpose – namely, to stem the spread of a highly contagious virus. Indoor dining has been shown to increase this risk. *See* Lutterloh Decl. ¶¶ 54-82 and attached exhibits; *see also Columbus Ale House*, 2020 WL 6118822, at *4 ("It is by now well-understood that the virus spreads more easily indoors and when people gather in close proximity. . . . [i]ndoor dining poses a greater risk of virus transmission than many other activities.").

Because Plaintiffs have raised neither a fundamental right protected by substantive due process nor an allegation that the State took action that "shocks the conscience," they cannot succeed on this branch of their claim. *See Seaport House*, 2021 WL 465437, at *7 (holding that the same restrictions at issue in this case neither "shock the conscience," nor interfere with a fundamental right susceptible to a substantive due process claim).

### C.   Plaintiffs' Equal Protection Claims Will Not Succeed

Plaintiffs next argue that the Executive Orders violate the Equal Protection Clause of the 14th Amendment to the U.S. Constitution. However, because they do not claim to be part of a suspect class, and because the Executive Orders are rationally based, they cannot succeed.[23]

"When a party challenges a government classification that does not involve a suspect class or burden fundamental rights, courts apply rational basis scrutiny. The classification will be constitutional so long as there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 136

---

[23] Plaintiffs' facial equal protection challenge (*see* Compl. ¶ 133) "faces an uphill battle because it is difficult to demonstrate that mere enactment of a piece of legislation violates the plaintiff's constitutional rights." *Cranley v. Natl. Life Ins. Co. of Vt.*, 318 F.3d 105, 110 (2d Cir. 2003) (internal quotation marks and citation omitted). "A facial challenge . . . is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

(2d Cir. 2013) (internal citation omitted). Challenged classifications are entitled to "a strong presumption of validity." *Id.* "The party attacking a classification's rationality bears the burden to negative every conceivable basis which might support it." *Id.* (citing *Armour v. City of Indianapolis,* 566 U.S. 673, 681 (2012)). "Rational-basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. Rather, [courts] are required to uphold the classification if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284 (2d Cir. 2015) (internal citations omitted).

Plaintiffs here point to two classifications that they challenge – that between "essential" businesses and those not deemed essential; and businesses located in New York City and those located outside of New York City. Because neither of these constitute a suspect class, their equal protection claim must necessarily be premised on a "class of one" theory.[24] To succeed on a "class of one" claim, Plaintiffs must demonstrate "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose – whether personal or otherwise – is all but certain." *Prestopnik v. Whelan*, 249 F. App'x 210, 212–13 (2d Cir. 2007) (internal quotations omitted). "A successful claim requires an extremely high degree of similarity between the plaintiff and her comparators." *Pappas v. Town of Enfield*, 602 F. App'x 35, 36 (2d Cir. 2015) (internal quotations omitted). To prevail on an equal protection class-of-one claim, a plaintiff must show that she has been intentionally treated differently from others

---

[24] Plaintiffs argue that a higher standard of review is triggered by the imposition on their "fundamental rights to their property and livelihood" (Pl. Mem. 17), but again, this is not a "fundamental right" within the meaning of the Constitution. *See, e.g.*, *Seaport House*, 2021 WL 456437, at *7 (in upholding the same Executive Orders at issue in this case, noting that "the Supreme Court has, for nearly a century, consistently rejected economic liberties as constituting fundamental rights") (citing *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391 (1937)).

similarly situated and that there is no rational basis for the difference in treatment. *Pappas*, 602 F. App'x at 36 (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

Plaintiffs in this matter fail to satisfy this test, with respect to either "class" they purport to be part of. First, they have failed to demonstrate the existence of any comparators with an "extremely high degree of similarity" to themselves. *Pappas*, 602 F. App'x at 36. With respect to the group of businesses not labeled as "essential," Plaintiffs do not point to any activities labeled as "essential" that are "highly similar" to themselves.[25] The *only* other activities that Plaintiffs compare themselves to are "private in home gatherings, visits to medical facilities and the New York City Subway system." (Pl. Mem. 18.) The differences between indoor dining above a certain occupancy percentage and these activities are manifestly obvious, from a public health standpoint, from an enforcement perspective, and in relation to the necessity to the continued functioning of New York City – restaurants permitted to operate at 25% instead of 50% occupancy are not "highly similar" to the subway. And with respect to the location-based "class," Plaintiffs cannot reasonably claim that restaurants located within New York City are similarly situated to businesses located in far less densely populated areas. New York City is a major, interconnected transportation hub that is comprised of the most populous and most densely populated counties in the State. *See* Lutterloh Decl. ¶¶ 88-92.[26] An infected person in New York City is far more likely to spread COVID to another person than someone located in a less dense area. *See, e.g.*, *Bocelli Ristorante Inc. v. Cuomo*, 2020 WL 7038722, at *7 (N.Y. Sup. Ct., Richmond Cty., Nov. 6, 2020) (in a case challenging New York City indoor dining restrictions, explaining that in less densely populated areas, "their potential to spread this deadly virus to mass amounts of people per square mile is markedly lower. . . . Thus, plaintiffs are not similarly situated to restaurant and bar

---

[25] Notably, Plaintiffs ignore that restaurants actually *were* classified as "essential," for take-out and delivery service. *See* ESD Guidance, *supra*, n.7. Plaintiffs are therefore not actually a member of the class that they claim was harmed.

[26] *See also supra*, n.13.

owners in Westchester or Long Island"). Plaintiffs have submitted no evidence, other than their own supposition, that there is no difference in the likelihood of increased spread of transmission as between New York City, and less densely populated areas.[27] With respect to both alleged classes, Plaintiffs have not alleged the existence of highly similar comparators, and their "class of one" claim thus fails.

Second, even if Plaintiffs *had* identified highly similar comparators that are being treated differently, all that is required for the government to justify a difference in treatment between highly similar comparators is a rational basis, *Pappas*, 602 F. App'x at 36, such that there is no inference that the plaintiff was "intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose – whether personal or otherwise – is all but certain." *Prestopnik*, 249 F. App'x at 212–13. Plaintiffs have not suggested – let alone established a likelihood of success – that the Governor has, for some unknown reason, decided to intentionally target New York City restaurants or businesses not designated as "essential" for any reason other than legitimate public health concerns. Nor would any such claim – that the Governor is intentionally trying to harm these establishments – be remotely plausible. To the contrary, it is entirely rational for the State's public health authorities to have calibrated restrictions based on the fact that viral spread is more likely to occur in a location with substantially higher population density and potential crowding than elsewhere in the State. *See* Lutterloh Decl. ¶¶ 88-92.

Neither classification that Plaintiffs raise – non-essential businesses, or New York City businesses – can support Plaintiffs' equal protection claim. Indeed, by seeking to increase capacity from 25% to 50% Plaintiffs implicitly acknowledge the existence of a rational basis for regulating restaurants in some way to protect public health, and as Judge Crotty recently reasoned, "the

---

[27] Plaintiffs point to the fact that some counties have higher infection rates than New York City but are permitted to operate indoor dining at 50% capacity. They ignore that New York City's lower infection rate may in fact be a *result* of the lower indoor dining occupancy rate, *supporting* the rationality of the directive, not undermining it.

constitutionality of [the challenged Executive Orders] cannot turn on granularities." *Seaport House*, 2021 WL 465437, at *6 (finding that plaintiffs' requested relief "implicitly concedes that public health regulation of restaurants, in view of the pandemic, is constitutional.").

### D.    Plaintiffs' Takings Claim Will Not Succeed

Plaintiffs' final argument is that the Executive Orders violate the takings clause of the Fifth Amendment of the U.S. Constitution. The Fifth Amendment's Takings Clause, which is applicable to the states through the Fourteenth Amendment (*see Kelo v. City of New London, Connecticut*, 545 U.S. 469, 472 n.1, (2005)) provides that no "private property [shall] be taken for public use, without just compensation," and is "designed to bar [the] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Fernandes v. Moran*, No. 2:17-cv-03430, 2018 WL 2103206, at *8 (E.D.N.Y. May 7, 2018) (quoting *Penn. Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 123-24 (1978)). "The Supreme Court has recognized two branches of Takings Clause cases: physical takings and regulatory takings." *1256 Hertel Ave. Associates, LLC v. Calloway*, 761 F.3d 252, 263 (2d Cir. 2014). Plaintiffs' allegations do not satisfy either branch.

### 1.    The Executive Orders Do Not Constitute a Physical Taking

"The paradigmatic taking requiring just compensation," known as a physical taking, "is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). *See also Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) ("The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use."). A physical taking "occur[s] when the government physically takes possession of an interest in property for some public purpose," *Buffalo Teachers Fed. v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006). But "the government effects a physical taking only where it requires the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 527 (1992).

The Supreme Court and Second Circuit precedent make clear that the Executive Orders do not effect a physical taking. Plaintiffs' establishments have not been physically occupied by the State government. Government action that does not entail a physical occupation, but merely affects the use and value of private property, does not result in a physical taking of property. *See Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 163 (S.D.N.Y. 2020) (McMahon, J.) (holding that the State's emergency eviction moratorium did not constitute a physical taking); *cf. Buffalo Teachers Fed.*, 464 F.3d at 374 ("The fact of a taking is fairly obvious in physical takings cases.").

2.   <u>The Executive Orders Do Not Constitute a Regulatory Taking</u>

A regulatory taking does not entail a physical occupation, but, rather, occurs when "governmental regulation of private property 'goes too far' and is 'tantamount to a direct appropriation or ouster.'" *1256 Hertel Ave. Assocs.*, 761 F.3d at 263 (quoting *Lingle*, 544 U.S. at 537). In determining whether a regulatory taking occurred, courts "must remain cognizant that government regulation – by definition – involves the adjustment of rights for the public good, and that [g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Lingle*, 544 U.S. at 538-39 (citations and internal quotation marks omitted). "Mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993) (citing cases where 75% and 92.5% diminution in value was held insufficient to establish a taking).

Plaintiffs bear a "heavy burden" in attempting to show that a governmental action effects a regulatory taking. *Buffalo Teachers Fed'n*, 464 F.3d at 375. To determine whether a regulatory taking has occurred, courts "engage in essentially *ad hoc*, factual inquiries to determine in each case whether the

challenged property restriction rises to the level of a taking." *Id.* (citation omitted).[28] "Paramount to the inquiry are the familiar factors set forth" by the Supreme Court in *Penn Central. 1256 Hertel Ave. Assocs.*, 761 F.3d at 264 (citing *Penn Central*, 438 U.S. at 124). Those factors include "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *Meriden Tr. & Safe Deposit Co. v. F.D.I.C.*, 62 F.3d 449, 454 (2d Cir. 1995) (citations omitted). As this is a fact-specific inquiry "designed to allow careful examination and weighing of all the relevant circumstances," *Murr v. Wisconsin*, 137 S. Ct. 1933, 1937 (2017), thread-bare factual allegations of harm, such as those offered by Plaintiffs, do not satisfy the *Penn Central* inquiry. A specific, detailed showing of how and to what extent a plaintiff is harmed is required to plead and prove that a regulatory taking has occurred. *See, e.g., Kabrovski v. City of Rochester*, 149 F. Supp. 3d 413, 424-25 (W.D.N.Y. 2015) (holding that economic impact alleged in "vague and conclusory terms," such as alleging "reduced business and lost revenues," does not satisfy *Penn Central*).

Plaintiffs here have not established that a regulatory taking has occurred. Most notably, Plaintiffs claim that they have been financially harmed, but offer no evidence of to what extent, other than a set of identically worded declarations on behalf of some (but not all) of the Plaintiffs that contain none of the specific facts necessary to support a takings claim. (ECF No. 8-1.) Without more, Plaintiffs' takings claim cannot be sustained. *See Elmsford*, 469. F. Supp. 3d at 165 (granting summary judgment to the State on a regulatory takings claim where plaintiffs had not submitted specific evidence of the extent to which they were harmed by the State's emergency eviction moratorium). Moreover, Plaintiffs admit that "[t]he character of the governmental action has been for the public welfare." (Pl. Mem. 20.) And they do not plead, nor show evidence, of specific facts sufficient to

---

[28] As such, regulatory takings claims are not susceptible to facial challenges. A regulatory taking claim "necessarily entails complex factual assessments of the purposes and economic effects of government actions." *Yee*, 503 U.S. at 523.

establish their "reasonable investment-backed expectations," nor the extent to which they were interfered with. Without far more detailed factual showings than Plaintiffs have made, their regulatory takings claim cannot be sustained.

## II.    PLAINTIFFS HAVE NOT SHOWN LIKELIHOOD OF IRREPARABLE HARM

Plaintiffs have failed to adequately show that the measures implemented to combat the COVID-19 pandemic will cause them irreparable harm. *Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*, 149 F. Supp. 3d 376, 390 (E.D.N.Y. 2016) ("To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.") (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).

Notably, it was announced that the restaurant plaintiffs will be permitted to resume indoor dining at 35% capacity during the pendency of this proceeding, and Governor Cuomo has announced that dining restrictions will be reevaluated based on infection rates and other data.[29] Further, outdoor dining remains permitted in New York City with the use of heat lamps, and take-out and delivery services are still permitted, as they have been throughout the pandemic.[30] For their part, Plaintiffs only offer the conclusory suggestion that all 74 of their businesses will inevitably close if the current guidelines are maintained, but have failed to demonstrate that the temporary restrictions on indoor dining, coupled with the continuation of outdoor dining and take-out and delivery, will lead to the

---

[29] *See* Governor's Press Release dated Sept. 9, 2020 ("the State will monitor any positivity increase on an ongoing basis and potentially reassess if necessary"); https://www.governor.ny.gov/news/governor-cuomo-announces-indoor-dining-new-york-city-allowed-resume-beginning-september-30-25.

[30] *See* EOs 202.38, 202.52, 202.61 and 202.74; *see also New York Times*, "Outdoor Dining to Become Permanent, Even in Winter" (Sep. 25, 2020)  *https://www.nytimes.com/2020/09/25/nyregion/nyc-outdoor-dining-restaurants.html*.

imminent closure of each of these businesses, rather than a temporary financial loss of revenue. *See Seaport House*, 2021 WL 465437, at *9 (holding that plaintiffs had not established irreparable harm caused by the same restrictions as those at issue here, as "Plaintiffs have not proffered any evidence on the record showing that their respective establishments are imminently likely to shut down because of the Dining Policy.").

On the other hand, the State suffers irreparable harm any time that it is enjoined by the court from enforcing one of its policies designed to protect public health. *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers). Here, such harm is manifest because the policy Plaintiffs seek to enjoin is intended to prevent the spread of COVID-19 and the resulting severe illnesses and loss of lives. Enjoining the Executive Orders would impair the State's ability to safely manage the reopening process for all of these establishments, among the riskiest of all industries, during a deadly pandemic and to protect the health, safety, and welfare of New Yorkers.

## III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF NEW YORK'S MISSION TO PROTECT ITS CITIZENS

Finally, the balance of equities and considerations of the public interest also weigh heavily against Plaintiffs. "As the Supreme Court reaffirmed in *Winter* [555 U.S. 7, 20] a plaintiff seeking a preliminary injunction must demonstrate not just that they have some likelihood of success on the merits and will suffer irreparable harm absent an injunction, but also that the 'balance of the equities tips in his favor and an injunction is in the public interest.'" *Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs.*, 769 F.3d 105, 112 n.4. (2d Cir. 2014). "These factors merge when the Government is the opposing party." *Make the Rd. N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) (citing *Nken*, 556 U.S. at 435).

Further, the reviewing court must ensure that the "public interest would not be disserved" by the issuance of the injunction. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). In exercising their discretion in whether to enter an

injunction, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *N.Y.S. Rifle & Pistol Ass'n v. City of N.Y.*, 86 F. Supp. 3d 249, 258 (S.D.N.Y. 2015), *aff'd*, 883 F.3d 45 (2d Cir. 2018). This consideration includes the government's interest in public health. *Million Youth March, Inc. v. Safir*, 155 F.3d 124, 125-26 (2d Cir. 1998) (modifying injunction because District Court failed to consider government's interest in, *inter alia*, public health against First Amendment rights).

The State's interest in preventing a the increased spread of COVID-19 cases, with the resulting spike in hospitalizations and deaths, is vitally important. And, ensuring that restaurants and bars reopen for indoor dining at a gradual and measured pace certainly furthers that interest. *See, e.g.*, *Columbus Ale House*, 2020 WL 6118822, at *5 (explaining that "[t]he public interest also weighs against plaintiff's injunction. . . . The state's elected officials must be allowed to exercise their judgment to protect the public health as restrictions on activities are slowly lifted."). Plaintiffs' interest in operating their businesses with a different occupancy percentage of indoor dining and drinking than is currently permitted hardly outweighs the critical need to ensure that the reopening of indoor dining for bars and restaurants does not endanger the public as a whole. *See Seaport House*, 2021 WL 465437, at *9-*10 (holding that enjoining the same dining restrictions as those at issue here would not be in the public interest).

Accordingly, the public interest and equitable considerations require the denial of Plaintiffs' motion. *See Winter*, 555 U.S. at 23-24 (holding "proper consideration" of public interest and equitable factor "alone require[d] denial of the requested injunctive relief").

## CONCLUSION

For the reasons set forth above, the State Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

Dated:  New York, New York
        February 23, 2021

                                LETITIA JAMES
                                Attorney General
                                State of New York


                          By: /s/ Matthew L. Conrad
                                MATTHEW L. CONRAD
                                Assistant Attorney General
                                28 Liberty Street
                                New York, NY 10005
                                (212) 416-8610
                                Matthew.Conrad@ag.ny.gov